## COOPER et v CENTRAL ALLOY STEEL CORP et

Ohio Appeals, 5th Dist, Stark Co

Decided Feb 5, 1931

Wilkin & Wilkin, Cleveland, Ford & Kiefer, Cleveland, and John F. Gorsuch, Canton, for appellant.

Day & Day, Cleveland, and Lynch, Day, Pontius & Lynch, Canton, for individual appellees.

Andrews & Belden, Cleveland, and Black,

McCuskey, Ruff & Souers, Canton, for the
Republic Steel Corporation.

SHERICK, J.

This claim of the Republic Corporation is undoubtedly sound law, but to our notion, in view of the facts of this case, the rule cannot work a dismissal of this action. The facts that Central Alloy has legally died since the filing of the second amended petition, that no demand was made upon Republic Steel to bring this suit, which it arbitrarily refused to do, and that the plaintiff is not a Republic stockholder, cannot abate this suit.

Republic draws our attention to §8623-65, GC, with the remark that its acquisition of Central Alloy was not a consolidation or merger, but was an outright purchase and sale of all Central Alloy's assets, and that the saving section §8623-69, GC, cannot aid the plaintiff. It is the policy of the new corporation act, and it is expressive of legislative intent, as is apparent from a reading of §§8623-68 and 8623-69, GC, that the pending right against consolidating and merging companies and their officers was intended to be saved, and this cannot be nullified by a future sale of the merged company to another company. The purchasing company, the Republic in this instance, knew or should have known at time of purchase of the pending action, and in view thereof, and in view of the further fact that it assumed the obligations and acquired the assets of Central Alloy, it will not now be heard to say that its purchase of the consolidated company protects it

from attack by reason of its purchase; but it now stands in the same shoes previously worn by Central Alloy, whose directorate has spoken for it. To hold otherwise would be to approve of a practice that might encourage fraudulent sales of corporate assets and result in dismissals of an injured stockholder's action, rightfully begun. The stockholder might be denied the right to his remedy at any time before judgment by an act of his adversary, and we know of no statute or rule of law dictated by sound public policy that should deprive him of his right to redress in such a case as the one at bar.

It is without doubt the law of this state that contracts made between corporations, which have interlocking directorates, in a minority thereof, are not void and are only voidable when such contracts are fraudulent and their execution would constitute a breach of faith reposed in the directors by the stockholders. And a stockholder has no right to maintain an action for the benefit of his company to void any such contract, unless it be shown that the directors have refused to sue and that such refusal was wrongful, fraudulent, and in breach of their trust duties to their company. If a stockholder can truly allege and prove these prerequisite facts, he then has the right to subject the transaction to the scrutiny of a court of equity.

It is said by this court in **Lake Hiawatha Park Assn. v Knox County Agricultural Society, 28 Oh Ap, 289, at page 293, 162 NE 653, 655, (6 Abs 615)**, that "there is no presumption that the directors have dealt unfairly or with any intent to * * * defraud either corporation."

This statement of the law finds ample support in Fletcher on Corporations, Vol. 4, §2347, page 3599: "The great weight of authority is that in case of dealings between an interested director or other officer * * * the transaction is valid and cannot be set aside merely because of the relationship of the parties, where the transaction is not unfair to the corporation and the officers have acted in good faith."

But we choose to consider the evidence on the merits of the controversy now before us in severer fashion by testing the proof offered by both parties, in accordance with the prevailing practice in some jurisdictions, as stated in Marcy v Guanajuato Development Co., (D.C.), 228 F., 150; that is, that the burden of showing that the "Sheet Bar Contract" was fair and free from taint of fraud be cast upon the defendants.

Several questions, therefore, present

themselves: Was the contract fair? Did it give to the Berger Company an undue advantage, profitable to it and the defendants Langenbach and Krieg? And was advantage taken of United Alloy? In other words, has fraud, actual or constructive, involving a breach of trust on the part of the United Alloy directorate, especially Langenbach, Jones and Krieg, intervened, that caused a loss to United Alloy.

There is little conflict in the evidence offered, and the answers to these questions can only be arrived at by such conclusion and inference as is deducible therefrom. It therefore follows that only reasonable inferences may be entertained.

It is disclosed that this contract of 1916 was a duplication of a prior existing contract between Berger and United Alloy, and that it contained, in fact, the same price and covenants, and that the contract of 1913 was mutually profitable to both companies. Seven or eight experienced steel men evidence the fact that the price was fair and a usual one of the trade. It appears that when the companies were operated by the government in the war period, the government adopted the same price formula. It is proved and conceded that United Alloy, during the first ten months of the contract, earned thereunder better than a half million dollars. It is shown that under government management severe losses resulted, for which the defendants cannot be charged and that after the companies were turned back to directorate management in 1919 the contract was modified from the agreed price to the market price, and under which Alloy lost money. Surely Alloy could expect no more for its product than market price, and the defendants were not responsible for the state of the market. It seems that in 1920 the price agreement was restored, and, unfortunately, Alloy again lost money.

The only reasonable inference that may be drawn is that Alloy's loss sustained in 1918, 1919, and 1920 was due to government management, increased cost of labor, and an unfavorable market. These directors could not anticipate, but under normal conditions, as existing in 1916 and 1917, and prior thereto, Alloy made a profit on this contract, and this to our notion justified and fully proved the good faith of the defendants and their directorates in the execution of the contract.

It appears that a back log contract, for a considerable period, in the steel industry, is ordinarily indispensable for plant maintenance, and that it is frequently advisable to perform such a contract, even if unprofitable, rather than to sustain a greater loss in damage to its furnaces by permitting them to grow cold. Alloy was therefore, no doubt, warranted in its execution of the contract, and in fairness it should have gone forward, inasmuch as it had induced Berger to forego entering into like contracts with companies competing with Alloy and to look to it for its steel bars.

We find that the plaintiff has wholly failed to prove this part of her alleged cause of action, and, examining the defendants' evidence in the light of the harsher rule previously indicated as the yardstick by which we measure, we find that the defendants have fully shown that the contract was fair and free of taint of fraud, and that under normal, contemplatible business conditions, as under the contract of 1913, Alloy would have enjoyed a nice profit on the contract. The defendants are not liable for that for which they are not responsible.

Coming now to consider the questions pertaining to the merger agreement, we deem it expedient to enumerate certain facts and figures.

The merger became effective as of December 31, 1920. At this time the total net assets available to United Alloy on its 525,000 shares of common stock were $25,085,530; to United Furnace on its 20,000 shares of common stock it was $3,440,103; and to Berger on its 30,000 shares of common stock it was $10,212,320. These figures represent the plaintiff's conception of the balance sheets of the three companies and their net worth, and are taken as the basis for plaintiff's claims.

It was provided in the merger agreement that Berger was to retain its net earnings for 1920 in excess of $1,200,000, after depreciation, dividends, and federal taxes were paid. And it is now claimed by the plaintiff that the defendant wrongfully transferred the sum of $723,358.83 to its profit account for the year 1920, in that thereby its net earnings were increased for the year 1920, and which, after payment of the three items mentioned, left a net earning remaining of $304,000, for which Berger received and distributed among its stockholders 30,000 shares of Alloy stock.

The contract is silent as to how the net earnings should be arrived at. We have carefully examined all the testimony of the accountants and bookkeepers offered on this feature of the case, for it is apparent that there is no fraud in the matter of this transfer if this be a proper manner of

bookkeeping and auditing, and from the testimony offered we are unable to say that it was improper. We find that the greater weight of the testimony denies the plaintiff's theory, and that the testimony of the plaintiff creates no doubt in our mind that Berger in all fairness and with full consent and understanding of all parties interested in the agreement did that which it was entitled to do and that which it was bound to do, for we cannot lightly pass over the fact that Berger stockholders were entitled to this fund and that Alloy stockholders were surely not entitled thereto.

As a matter of bookkeeping and accounting it is equitable and just and fully proven to be good practice and usual to transfer or credit net earnings for the year with old accounts received therein, and to pass previously created reserve fund balances, found not needed, to earnings. In fact, it is common practice to so do, for at a year's end the earnings of a business may be represented by accounts receivable and in such case, if the plaintiff's theory be true, the stockholders of that business reap no profit for the year, and these earnings thereafter received could not be considered as earnings for the next year, for they were earned in the preceding year. We, therefore, determine that there is no logic in this claim, and that no fraud or breach of faith has been proven, but rather, to the contrary, it has been proved that the transaction was fair and just.

As previously indicated from the figures given, the plaintiff maintains that the ratio of exchange, as allotted, was unfair to Alloy, and therefore fraudulent, and constituted a breach of trust; but the plaintiff seems to purposely overlook many other factors that must enter into consideration when a merger is contemplated.

The fact should have been and was considered that for a period of a year preceding the merger date Alloy charged off for depreciation five per cent. per annum, and that during the same period Berger charged off 15 per cent. per annum, and Furnace likewise charged off an appreciable amount. Further, Berger and Furnace had enjoyed a uniformly profitable past, while Alloy had not been as fortunate. The physical condition of the plants was another vital factor unfavorable to Alloy. Not having the earnings, it failed in maintenance and betterment. Further, Alloy gained by merger with the more profitable plants, and Berger and Furnace accepted appreciable burdens from the admittedly weaker financial sister Alloy, which could but mean lesser anticipated profits for Berger and Furnace. And, again, the evidence shows that Furnace's balance sheet did not represent its true worth. On the other hand, there were certain advantages common to all; a complete process was formed, from ore in the mine to finished product, whereby there would be a saving in taxes, operating expenses and overhead cost, but in these the companies shared equally, except that Alloy saved itself a considerable annual charge in the operation of Furnace.

Referring further to the assets of the Furnace, owned jointly by Pickands-Mather Company and United Alloy, we learn that its physical plant was carried at a very low figure, that it was comparatively new, built in a time of depression, and that its replacement value would exceed seven million dollars. It further appears that Furnace owned a benzol plant of a value of $300,000, not carried on its books, and that it owned or was interested in two iron mines, and that the worth of its interest therein was $900,000, which, also, was not on the books of Furnace, and, further, that this company had a great earning power.

Another fact appears—that Berger owned 105,000 shares of Alloy common, which was about one-fifth of the latter company's common stock, which Berger carried on its books at $29.75 per share and at the time of merger was selling at an average of $30 in the open market—and some months later, after Alloy had passed its dividend, which the contracting parties undoubtedly anticipated, Alloy common sold on the exchange as low as $19 per share. At the same time, it is conceded that Berger common had a book value of $340 per share, and had sold on the market as high as $400 per share.

It appears further, for the purpose of equalization, from the original plan of merger of date of June 11, 1920, and the presidents' agreement thereafter, and the final contract of merger of March 4, 1921, that Berger was to keep its 105,000 shares of Alloy common and to further receive 165,000 shares of Alloy. In view of these apparent facts it seems to us unjust for the plaintiff to insist that Berger pay Alloy $47.78 for its stock, when Berger, out of moneys in hand, could have purchased this stock in the open market at $30 or less.

And this court concludes, from a consideration of the balance sheets of the companies for the years 1918, 1919 and 1920, and the actual book value of the respective stocks as augmented by omitted assets previously commented upon, and the sustained

past and reasonably anticipated earning power and profits of Berger and Furnace, and Alloy's lack thereof, that the ratio of exchange of ten for Berger, eight for Furnace, and one for Alloy was right, and, if anything, more than fair to Alloy's stockholders. Defendant Jones, if he was dominated by defendant Lagenbach—as plaintiff contends and of which fact we are convinced to the contrary—seems to have taken excellent care of those dependent upon him, including this plaintiff. Her allegations of fraud are not substantiated by any credible evidence, while the evidence of the defendants, on the other hand, clearly convinces us of the falsity of plaintiff's claim.

Two further matters, which seem to be not understandable to plaintiff, should be commented upon: First, the fact that Pickands-Mather received a larger per cent. of Alloy shares of merger stock for its half of Furnace than did Alloy. Keeping in mind that Alloy did not and could not purchase its half of Furnace, which it already owned, and the facts and figures previously enumerated, and the further fact that Furnace owned no part of Alloy stock, as did Berger, and that Furnace owed Alloy no favor, it is plain to us that Alloy should pay Pickands-Mather for the valuable things that it received by the consolidation, and that Pickands-Mather relinquished. And, again, it may be suggested that neither Alloy nor the plaintiff is entitled to something for nothing.

The plaintiff says that Pickands-Mather received $1,800,000 more for its half interest in Furnace than it should have received. This contention is grounded on the fact that Alloy carried on its books its interest in Furnace at $1,400,000. This latter sum cannot be used as a basis of payment to Pickands-Mather for its half interest. The real value thereof, that is, the actual value of this half interest, is what the merger agreement provided was to be paid, and which was rightly paid for by merged Alloy stock to Pickands-Mather. We are unable to comprehend or appreciate the temerity of the plaintiff in her complaint that Alloy should have forced Furnace, or rather Pickands-Mather, to sell its half interest in Furnace at a price the purchaser might fix, irrespective of its actual worth. The fact that Alloy carried on its books its half of Furnace at a lesser figure is simply a matter of bookkeeping, and Alloy's net worth at time of merger was not impaired thereby. The testimony offered conclusively shows that Alloy's net worth was fairly and impartially arrived at, and such was

used in determining the ratio of exchange in the entire transaction.

The second matter that bothers plaintiff is equally plain. It is insisted that the agreement provided that the merged company should have but 800,000 shares issued and outstanding, and that in fact 905,000 shares were issued, and that this difference of 105,000 shares Berger wrongfully and fraudulently received at the expense of Alloy stockholders. It was proposed by the accountants, out of their fertile brains, that it was desirable to clear the 105,000 shares of Alloy owned by Berger, without duplication of issue, rather than that it be declared as a dividend, and this was carried into the contract. It accomplished but one thing, that Berger saved its stockholders thereby a large sum in government taxes. This 105,000 shares was issued, and later reissued, and reposed in Central Alloy's treasury as treasury stock when it sold to Republic; hence we do not see that this issue of stock benefitted Berger stockholders, except in tax savings, with which Alloy stockholders were not interested or concerned, and which deprived the latter of not one penny.

It is also strongly asserted that defendant Jones misled his directorate and stockholders in the form and insufficiency of his notice of the stockholders' meeting called to ratify the merger plan. We are not impressed with this assertion. The notice is regular and sets forth the basis of exchange. It would have been next to impossible to have stated in the notice all that was proper matter for discussion in the stockholders' meeting called to approve the resolution proposed, which was subsequently adopted by the vote of 419,740 Alloy shares. We find that the matter of merger was an open question for nearly a year, that fraudulent misstatement or concealment was not employed, that there were no secret agreements between the contracting parties or their directors, that there is no fraud shown, either actual or constructive, that there is no breach of trust proven, that the individual defendants reaped no profit that rightfully belonged to Alloy, and that the plaintiff upon the merits of the case must fail.

The basis of the plaintiff's right to bring this suit rests upon the fact that Central Alloy wrongfully refused to bring this action, that its investigation thereof was perfunctory and arbitrary, its refusal expedient and wrongful, and that such action constituted a breach of trust. This we find to be untrue and wholly unsupported by

the evidence, and the contrary is proved, in that the board of directors caused an investigation to be made covering an adequate period of time and at considerable expense to arrive at the truth of the plaintiff's claim. The failure of the plaintiff to prove, and the lack of concealment, fairness, and proof made of the facts to the contrary by the defendants, must of themselves defeat the plaintiff's claims.

We further draw from the record the fact that the plaintiff acquired her stock in Central Alloy from the issuance of the merger stock. She seems to have received these shares from the Canton Stamping & Enameling Company, which was a stockholder in one of the merging companies, which one the record does not disclose. She says that she received these shares as a declared dividend in 1926, five years after the merger, from the enameling company. That being true, the plaintiff did not become a stockholder in United Alloy or Central Alloy until long after the matters complained of, and we do not know by what right she is now entitled to question those acts of which she now complains, in which she had no interest until some five years thereafter.

There is no proof that the enameling company owned any stock in United Alloy. It might have acquired its stock by virtue of stock ownership in Berger, and it cannot be assumed, in the absence of proof, that the enameling company owned United Alloy stock. If the enameling company acquired its stock in Central Alloy by virtue of stock ownership in Berger, it or this plaintiff could not profit by this action, for the wrong complained of, if any, is done Alloy, not Berger.

We are advised that two Ohio courts, in the cases of **Dissette, Exr. v Lawrence Publishing Co.**, 19 C.D., 168, 9 C.C. (N.S.), 118, and **Santen v U. S. Shoe Co.**, 25 N. P. (N. S.), 363, have considered the question of the application of the federal rule announced in Hawes v Oakland, 104 U. S., 450, 26 L. Ed., 827, that a stockholder, in order to question a transaction for fraud of the company's directors, must be a stockholder at the time, or that his shares have come to him since, by operation of law. In each of these cases the question was not in issue and it was unnecessary to determine if this state should follow the federal rule or adhere to the adverse rule applied in some states, as announced in Pollitz v Gould, 202 N. Y., 11, 94 NE, 1088, 38 L.R.A., (N.S.), 988, Ann. Cas., 1912D, 1098. In the Pollitz case the court pronounces the rule of that jurisdiction to be otherwise, but qualifies it in the very first line of the second paragraph of the syllabus by saying: "A stockholder may bring an action in behalf of the corporation for the benefit of himself and all other stockholders * * *." And therein the court further says that no such circumstances are disclosed in this suit. These rules are considered and authorities collected pro and con in two valuable notes appearing in 38 L.R.A. (N.S.), 988, and L.R.A., 1917F, 704.

It is not necessary for a determination of this action for this court to say which rule is the law of this state, but considering that as the law which is most favorable to the plaintiff, we do not find that in this case there are special circumstances which should forbid the application of the general New York rule. The matter of the "Sheet Bar Contract" is some thirteen years old, and that of the merger is some eight or nine years old. We further refer to the contract, the reorganization and the formation of the new company under Hornblower & Weeks, and the merger of 1920; the sale to Republic and the dissolution of Central Alloy; the staleness of the equities claimed; the few shares owned by the plaintiff; the small amount of profit that would inure to her should she prevail; the difficulty of distribution of any sum among the stockholders of United Alloy prior to consolidation, to whom such a fund would rightfully belong; the acquiescence of her assignor to the transactions; and the fact that she did not come into possession of her shares by purchase or operation of law, but as a dividend to her by the Enameling Company, where purchase price did not enter: and, further, to the important fact that proof is not made that the enameling company received these shares as a stockholder of United Alloy, which fact cannot be assumed. The plaintiff was unable to or did not explain this special circumstance, and the proof therefore, lacks that clearness required by a court of equity as a predicate to the granting of the relief herein sought.

If her asserted right to sue be the law under such circumstances, and alleged fraud be pleaded as lately discovered, no merger or consolidation or corporate contract is sacred or free from attack years afterwards.

Were it necessary to hold, in a determination of the plaintiff's right to maintain this action, that the plaintiff was estopped from so doing, this court would not hesitate to apply that rule; but testing the facts in this case by the severest test, by

casting on the defendants the burden of showing that the transactions were fair and free of taint of fraud, which we do not hold or find to be the rule in this state, we reach the opinion that the defendants have fully and completely refuted the charges made and overcome the burden perhaps unjustly imposed upon them by this court.

It must follow that the plaintiff's petition be and the same hereby is dismissed at her costs, and judgment is entered for the defendants.

Petition dismissed.

LEMERT, PJ, and MONTGOMERY, J, concur.