KLEIN *v.* FISHER FOODS, INC., ET AL.

[Cite as Klein v. Fisher Foods, Inc., 6 Ohio Misc. 84.]

(No. 810486—Decided June 16, 1965.)

Common Pleas Court of Cuyahoga County.

*Messrs. Benesch, Friedlander, Mendelson & Coplan, Mr. George N. Arnoff, Mr. Marvin Kelner, Messrs. Walter & Haverfield* and *Mr. Paul W. Walter,* for plaintiff.

*Messrs. Calfee, Fogg, McChord & Halter, Mr. Richard J. Cusick, Jr.,* and *Mr. A. A. Sommer, Jr.,* for defendants Fisher Bros. and individual directors.

*Messrs. Thompson, Hine & Flory* and *Mr. Timothy F. McMahon,* for defendants Fazio Corporations and Fazios individually.

*Messrs. Kohrman, Kohrman & Madorsky* and *Mr. S. Lee Kohrman,* for defendants Costa Corporations and Costas individually.

*Mr. Morton M. Stotter,* for defendants Seaway Foods, Inc.

THOMAS, J.   Owner of 250 shares of common stock of Fisher Foods, Inc., the plaintiff brings this derivative suit principally to enjoin defendant Fisher and the defendant Fazio-Costa Corporations, their directors and representatives from consummating and effectuating the merger of these companies.

Defendants admit that they "would not have commenced or prosecuted this action upon plaintiff's demand as no wrongful act has been committed by any director or officer in connection with the subject transaction."

If completed the merger would consolidate in surviving Fisher Foods the separate food retailing operations of Fisher, Fazio and Costa.  As of February 4, 1965, Fisher operated 74 retail food stores in northern Ohio, 55 of which were in Cuyahoga County.

The Fazio corporations (Fazio, Inc., Foodlane, Inc., Ware-

house Merchandising, Inc., J. & C. Super Markets, Inc., and Food Enterprises, Inc., are principally owned by Carl and John Fazio, their mother, Mrs. Josephine Fazio, and their brother-in-law, Joseph Fana. The first Fazio grocery store, still operated as the Fazio partnership, is at 2255 Lee Road, Cleveland Heights, Ohio. Since 1949 the Fazio family grocery business has expanded into five retail food supermarkets, all in the Cleveland area. Prior to January 5, 1965, these self-service supermarkets and the partnership store operated as part of the Stop-N-Shop Super Markets Association, a buying and merchandising group of 16 independently-owned stores.

The Costa corporations (Costa's Stop-N-Shop, Inc., and Costa's Bakery, Inc.), are owned by Sam (51%) and Frank (49%) Costa. In North Royalton, Ohio, they operate a retail food self-service supermarket and a self-contained bakery adjacent to the supermarket.

On March 9, 1965, at a specially called meeting of shareholders of Fisher Foods, the merger, here sought to be enjoined, was approved by more than two-thirds of Fisher's common shareholders and by more than two-thirds of Fisher's preferred shareholders. The vote thus exceeded the two-thirds minimum required to approve a merger by Section 1701.79 (B), Revised Code.

However, in her petition, plaintiff generally contends that, in considering and approving said merger, the individual defendants did not act pursuant to the unprejudiced exercise of their independent judgment, but acted primarily in their own special interests, and that of the defendant Fazio-Costa Corporations, in violation of their fiduciary duties to defendant Fisher and the minority shareholdres of such corporation.

Before the several claims of plaintiff's petition are examined major events leading up to the March 9th shareholders' meeting will be summarized.

For several years Fisher's management (Fisher-Conway-Salmon) had been attempting to sell their Fisher interests. Fisher sales and earnings were dropping, and in 1963 and 1964 Fisher Foods lost money. Merrill Lynch, Pierce, Fenner & Smith, Inc., as Fisher's investment banker, had contacted 12 different national food chains, searching for a buyer. Merrill Lynch is one of the nation's largest stock brokerage firms. One of its specialties is food lines.

In the fall of 1964, Seaway Foods, Inc., a wholesale grocery concern (which supplied Stop-N-Shop stores), Stop-N-Shop owners, Rego, Rini, Fazio and Costa and Julie Kravitz, executive director of the Stop-N-Shop association, offered to buy Fisher's at $9.80 a share. They refused the Fisher selling price of $12 a share when an examination of Fisher's records revealed an unrecorded employee retirement pension liability of over two million dollars. Had the Seaway offer to purchase been accepted by Fisher, Seaway would have purchased fifty percent of the management common stock and the other five members of the group, ten per cent each.

Merrill Lynch renewed negotiations with a selling price of $10 a share and on January 5, 1965, the Fazio-Costa-Seaway group purchased the Fisher common stock owned by the Fisher management (55%, or 320,053 of the 579,239 common shares issued and outstanding). Rego and Rini were no longer in the buying group.

On January 5, 1965, Fazio, Costa and Seaway entered an agreement. Under its terms the Fazio corporations purchased 246,058 common shares, the Costa corporations purchased 10,-000 shares, and Seaway purchased 63,995 shares.

In the agreement of January 5th the parties bound themselves to prepare an agreement of merger of the Fazio-Costa operations and Fisher Foods and to vote "all shares owned by them in Fisher and in the corporations which are parties to this agreement in favor of the Agreement of Merger."

To finance the Fazio-Costa purchase of Fisher common stock, on January 4, 1965, Union Commerce Bank lent the Fazio-Costa corporations sums totaling $2,560,580, to be secured by the 256,058 shares purchased.

At a meeting of the Fisher Board of Directors held on January 5, 1965, each of the seven directors (representing Fisher-Conway-Salmon management) resigned, and in their places were elected Carl Fazio, Sam Costa, John Fazio, Julie Kravitz, Jack N. Falcon, Ralph Garson and Joe Fana. Jack N. Falcon, a certified public accountant has performed Fazio's accounting services, and is now directing Fisher's accounting services. Ralph Garson is an officer and director of Seaway Foods.

At a board meeting of January 13, 1965, the new directors approved the Agreement of Merger, as presented. The board

designated March 9, 1965, as the date for the shareholders' meeting to vote on the merger agreement, on a proposal to fix the number of directors of Fisher Foods, Inc., at nine, and to elect directors to serve until the 1966 annual meeting of shareholders.

Neither with reference to a merger [Section 1701.79 (A), Revised Code] nor to any other corporate transaction does Ohio law require a proxy statement to be submitted to the shareholders. Nevertheless under date of February 4, 1965, a twenty-two page proxy statement with attached copy of the Agreement of Merger was mailed to each Fisher shareholder. Several excerpts are here quoted. The first describes the rate of exchange,

"Upon approval of the merger by the shareholders of Fisher and upon the occurrence of other specified conditions Fisher will issue to the shareholders of the various Fazio corporations an aggregate of 614,000 shares and to the shareholders of the Costa corporations an aggregate of 91,600 shares of Fisher Common Stock * * * (One of the specified conditions is obtaining a ruling from Internal Revenue Service, since applied for, to the effect that the proposed merger will not result in any gain or loss to the constituent corporations or to their shareholders under the Internal Revenue Code)."

Later the proxy statement states that,

"All shares of Fisher Common Stock other than those owned by the Fazio and Costa corporations will upon occurrence of the merger remain outstanding and unchanged in the hands of the holders thereof * * *."

The proxy statement explains that by operation of law the merger will extinguish the 256,058 shares owned by the Fazio-Costa corporations at the effectiveness of the merger.

With reference to the Union Commerce Bank loan of $2,560,580 the proxy statement declares that Fisher will assume this indebtedness. It states:

"The shares of Fisher Common Stock owned by such corporations at the effectiveness of the merger * * * will be extinguished by operation of law in the merger and will not be outstanding thereafter and the indebtedness incurred in connection with their purchase will become, also by operation of law, the indebtedness of Fisher."

In the March 9th shareholders' vote on the proposed mer-

ger, of the 27,000 preferred shares, 21,708 voted for the merger and 3,091 shares voted against the merger. None of these shares are owned by the Fazio-Costa-Seaway group.

At the record date for notice of the meeting there were 579,239 shares of common stock. Voting for the merger were 450,759 shares, and voting against the merger were 6,936. Not voting were 121,509 shares. Those voting for the merger included 449,509 management proxies and 1,250 voting in person.

Originally some principals in the Fazio and Costa corporations opposed merger, favoring the separate operation of the Fazio, Costa and Fisher stores. There was concern about combining the successful Fazio and Costa operations with the losing Fisher enterprise. Chief considerations deciding for merger were the efficiencies of centralized and co-ordinated management, and the avoidance of conflicts of interest that might arise between the corporations in allocating new store locations and in improving existing stores.

The determination to merge was sealed by the binding agreement to vote the Fazio-Costa-Seaway stock for merger, a precaution that was undoubtedly prudent for the group. Yet the predetermined judgment to merge blurred the independence of the directors' judgment (however good a business judgment it may have been), when merger was approved by the directors on January 13th. The predetermined judgment to merge largely contributed to the shareholders' vote of merger approval on March 9th, as the vote shows, rendering it the vote of an interested dominant majority (distinguishable from the disinterested majority found in *Claman* v. *Robertson,* 164 Ohio St. 61). Therefore, as controlling directors and dominant shareholders a fiduciary duty was imposed on them. *Pepper* v. *Litton,* 308 U. S. 295.

But does the dual role of the Fazios and Costas, as principal buyers and as sole sellers in the merger transaction, void the transaction, as the plaintiff claimed in final argument? In a true case of self-dealing a contract or transaction between a corporation and its directors may be illegal and unenforcible, *Briggs* v. *Grocery Co.,* 116 Ohio St. 343. Though the Ohio Supreme Court has not decided the point, a helpful rule, applicable in a merger in which the dominant directors are on both sides of the transaction is supplied in Delaware, one of ''the

two leading corporate homes," Dissenter's Appraisal Right, 77 Harvard Law Review 1189. In *Sterling* v. *Mayflower Hotel Corp.* (1952), 33 Del. Ch. 293, Delaware Supreme Court recognizes "the settled rule" that directors who stand on both sides of a merger transaction "bear the burden of establishing its entire fairness, and it must pass the test of careful scrutiny by the courts."

Comparable is the rule in *Truman* v. *The Coghlin Machinery & Supply Co.*, 11 Ohio App. 220, that "where two corporations have a majority of their directors in common, transactions between them are subject to scrutiny, and are sustained only if they are fair and made in good faith."

It is therefore determined that the present merger proposal is not void or unenforcible. Its fairness and good faith must be scrutinized. The inference of unfairness, arising by reason of the self-dealing aspects of the transaction, must be overcome by a preponderance of all the evidence, if the merger is to stand. The burden of proof rests upon the defendants, Ohio apparently following this widely accepted rule, *Hatch* v. *Newark Telephone Co.*, 34 Ohio App. 361, at p. 378; *Cooper* v. *Central Alloy Steel Corp.*, 43 Ohio App. 455, at p. 462.

The claim in plaintiff's petition to which most of the trial questioning and testimony was directed is the allegation that,

"The issuance of 705,600 shares of the common stock of defendant Fisher to the individual defendants and others, in exchange for such persons' stock holdings in the defendant Fazio-Costa corporations, is unfair in that such number of shares represents a value substantially in excess of the value of the defendant Fazio-Costa corporations."

Concerning rates of exchange in mergers two witnesses testified. One was Carroll Wright Cheek, certified public accountant of Bowling Green, Ohio, with considerable experience in supermarket accounting. Owner of supermarkets, he has served as consultant in the present transaction, as he has done in merging other diverse supermarket operations. Thomas L. Chrystie, the other witness, is a regional executive in the department which handles all investment banking activities at Merrill Lynch, Pierce, Fenner & Smith, Inc. He has participated in fixing rates of exchange in about 200 merger transactions.

Cheek testified that "earnings" is the principal factor which determines a company's valuation. His examination of twenty-five food retailing corporations reflected a price-earnings ratio (factor multiplied times annual earnings equals number of outstanding common shares times price per share) of 11 to 20. His recommendations of 12 for the Fazio corporations and 12.2 for the Costa corporations were both accepted and adopted, in the merger transaction.

Chrystie testified that most recent earnings are of prime importance "because they are the best indication of what the corporation can earn in the future." Book value (net worth, and common shareholder's equity are synonymous) is of minor importance, he said.

The evidence revealed that Fisher Foods yearly sales have dropped 19% since 1961 while for the same period Fazio-Costa sales have increased approximately 100%. Fisher Food profits have declined since 1960, with losses sustained in 1963 and 1964. In the last four years Fazio-Costa profits have increased each year at about a 20% rate.

There is no dispute over the earnings approach to corporate valuation. Nor is there objection to the merger maintaining the same number of shares of Fisher common stock other than those owned by the Fazio-Costa corporations. Fisher Foods having no earnings from which value may be computed, there would be no basis for issuing additional shares to these other Fisher common shareholders.

Controversy focuses on the method by which the earnings base for the Fazio-Costa corporations is determined in the merger. In arriving at $586,775 ($511,673 for Fazio and $75,102 for Costa), the fiscal year preceding November 28, 1964, was used for Fazio's, Inc. But for the other Fazio-Costa corporations (none of whose fiscal years then ended) varying periods (since the end of the last fiscal year) were used. In using these periods certain non-recurring expenses were eliminated. Where the actual earnings were less than a full year the monthly earnings average was determined and then annualized (multiplied by 12).

Using Cheek's recommended price earnings ratios, Fazio earnings are multiplied by 12, and Costa earnings by 12.2. The total of the two products is $7,056,310. Dividing this total by

$10 per share (the price paid Fisher-Conway-Salmon) develops 705,600 as the number of common shares to be issued in the merger to the Fazio-Costa corporations.

It is the plaintiff's contention that for those months in which there were no actual earnings for the Fazio-Costa corporations the earnings of the corresponding month for the preceding year should be used. Employing the annualized method the earnings base totalled $586,775. Had the method urged by the plaintiff been used the total would have been $500,000 which capitalized with a multiplier of 12 produces about a million dollars less, as the valuation of the Fazio-Costa corporations. Hence the number of shares thereby issuable to Fazio-Costa corporations would have been 100,000 fewer.

The proxy statement lists the exact calendar period forming the basis of the annualization for each Fazio and Costa corporation. It then recites,

"Statements for less than a full year have been annualized by simple extension. The managements of the respective corporations believe that the statements used in preparing the following income statements fairly present the results of operations of the respective corporations."

The proxy statement then tabularizes unaudited income statements for the Fazio Corporations, Costa Corporations, Fazio and Costa Corporations, Fisher Foods, Inc., and Fazio and Costa corporations and Fisher Foods, Inc. With reference to these income figures in the proxy statement, Cheek was asked whether "the sales and the income for those periods, reasonably reflected continuing levels of operations, sales, and profits of the companies at that time." He answered, "Yes, I thought they were conservative because the trend was upward."

Chrystie testified that he did not think that we (Merrill Lynch) would have recommended to anybody that 12 x $500,000 was fair. He felt the proxy statement reflected what was currently happening on an annual basis. He pointed out that had the twenty-per cent growth factor of the Fazio-Costa companies been used one would have come up with much higher figures of value. He stated that at a January New York meeting of principles his firm expressed the opinion that the rate of exchange seemed fair to the Fisher common shareholders. His statement

assumes added weight since Merrill Lynch owns in its own name or for others, 40,000 shares of Fisher common stock. It is the largest holder of publicly owned shares. With the approval of Merrill Lynch the proxy statement declares,

"The rate of exchange was determined in consultation with Merrill Lynch, Pierce, Fenner & Smith, Inc."

Upon the persuasive and uncontroverted testimony of Cheek and Chrystie, and upon all the evidence in the record it is found and determined that a reasonable rate of exchange in the merger transaction warrants the issuance of 705,600 shares of Fisher Foods common stock to the Fazio-Costa Corporations and this stock interest in Fisher Foods fairly represents the value of the defendant Fazio-Costa corporations.

Three claims of the plaintiff's petition will be studied together. It is alleged that,

"a. By causing defendant Fisher to assume the aforesaid obligations owed to a bank * * * in the amount of at least $2,560,580 * * *

"1. The individual defendants are thereby utilizing the assets of defendant Fisher to pay the entire purchase price of the common stock interest in defendant Fisher which was purchased by the individual defendants' controlled corporations * * *

"2. The financial condition and credit of defendant Fisher will be greatly impaired and the ability of defendant Fisher to meet its expenses of operation and other liabilities will be greatly diminished;

"3. Defendant Fisher will be placed in a position of default under a presently existing 5⅜% promissory note in the current amount of $3,500,000 evidencing a borrowing by defendant Fisher from an insurance company."

President George Herzog of Union Commerce Bank testified that the bank has agreed to refinance the Fazio-Costa loans totaling approximately $3,300,000 to be assumed by Fisher under the merger. The maturity date of December 31, 1965, of the January 4, 1965, loan of $2,560,580 (which financed the Fazio-Costa corporations' purchase of the Fisher common stock) will be extended, a period of six years having been discussed.

President Herzog also stated that the bank was perfectly

willing to accord to the wishes of Equitable Life Assurance Society, when shown its letter of May 21, 1965 to John Fazio. Equitable, subject to certain conditions expressed in the letter amends Fisher Food's note of $3,500,000 (5⅜%) to permit "the company to have outstanding the proposed Funded Indebtedness to the Union Commerce Bank in the maximum amount of $2,500,000, with payments thereon to be due so that such indebtedness is retired within three years. We understand that such indebtedness is to be incurred by the company to the bank in connection with the proposed merger as described in the company's proxy statement of February 4, 1965."

Based on the pro forma balance sheet of Fisher Foods (giving effect to acquisition of shares and merger), as of December 26, 1964, Herzog, life-long banker and financial advisor, was asked whether Fisher can make payment of $800,000 (needed to reduce the Union Commerce Bank indebtedness to $2,-500,000 in accordance with Equitable's letter). He answered, it appears that it can do it without any difficulty.

Equitable's letter of May 21st expressly waived any default by reason of the indebtedness of Fisher Foods to the bank for a limited period.

Upon this evidence neither the claims of subparagraphs (2) or (3), recited above, are supported. The Union Commerce Bank indebtedness will not impair the financial conditions and credit of Fisher Foods. Its Equitable note will not be defaulted.

Central and serious is the charge in subparagraph (1) that the defendants in causing Fisher to assume the $2,560,580 obligation are thereby utilizing Fisher assets to pay for the Fisher common stock purchased by the Fazio-Costa corporations. This claim is at the heart of the plaintiff's attack on the merger and her charge that the Fazios and the Costas have engaged in self-dealing.

This claim may be analyzed by supposing that the Fazio-Costa-Seaway group abandoned the merger but, by express action of the Fisher Board, caused Fisher Foods to assume the Union Commerce Bank debt of the Fazio-Costa corporations. With the Fazio-Costa corporations then still operating, and with these corporations controlling Fisher, suppose Fazios and

Costas had caused the Fazio-Costa stock purchase debt of two million and a half dollars to be paid out of Fisher assets. This would be deliberate self-dealing, personally beneficial to the Fazios and Costas, without any corresponding benefit to Fisher Foods, Inc., and its common shareholders.

In contrast with this suppositious situation, in the merger under scrutiny the Fisher assumption of the Union Commerce Bank loan occurs not by express act of assumption but by operation of law. Section 1701.81, Revised Code. Fisher as the surviving corporation, by the effect of merger, possesses all the Fazio-Costa property and interests of every description, and becomes ''liable for all the obligations of each of the constituent corporations.'' Hence Fisher's legal assumption of the indebtedness is not an express debt assumption which is to be judged for any deliberate self-dealing propensities. Instead the entire merger transaction, of which the debt assumption is an involuntary part, must be scrutinized for its fairness to Fisher Foods, Inc., and its common shareholders.

With the merger effected the capacity of the Fazio-Costa corporations to pay the Union Commerce Bank indebtedness passes to Fisher Foods, Inc. So does the indebtedness. Likewise the Fisher Food common stock, purchased by the Fazio-Costa corporations, is part of the Fazio-Costa property which passes to Fisher Foods, Inc.

In the merger transaction the 256,058 shares of common stock, upon reaching Fisher Foods, Inc., are thereby extinguished. Seven Hundred and Five Thousand, Six Hundred (705,600) new shares of Fisher common stock are simultaneously issued to the Fazios and the Costas.

The issuance of these new shares will raise the total shares of common tock from 579,239 to 989,477. This will reduce the book value of each common share (explained in the proxy statement) from $13.89 a share (as of December 26, 1964) to $6.51 as of the same date. The proxy statement evidences good faith concerning this book value of $13.89 in specifying that,

''In the event of any liquidation of Fisher during the period of one year from the effectiveness of the merger, the holders of shares issued to the shareholders of the Fazio-Costa corporations will not be entitled to receive any amount upon such liqui-

dation until the holders of the other common shares have received $13.89 per share, the book value per share of common stock at December 26, 1964.''

On the other hand the reduction in book value, after the merger, to $6.51 per share, due in part to the assumption of the Union Commerce indebtedness, applies to all common shareholders, including the Fazios and the Costas who would then own 59% of the common stock.

In any event, as several witnesses testified, earnings, not book value, is of first importance. Fisher common stock dividends were reduced in 1963, and discontinued in 1964. The twenty-five cents per share paid in 1963, and the twenty cents per share paid in 1964 were not paid out of earnings. Fisher Foods lost money in the last two years.

By the merger Fisher Foods, Inc., a sickly corporation, will receive a transfusion of healthy economic life blood. It will immediately acquire the existing earnings of Fazio-Costa supermarkets, and a vital earning capacity, growing at an annual rate of twenty (20%) percent, according to the evidence. Difference in earnings parallels the contrast in floor space. The average Fazio-Costa supermarket has 26,000 square feet, while the average Fisher supermarket has 16,000 square feet.

Under the successful supermarket management which has taken the Fisher helm, merchandising innovations are already under way, the evidence disclosed. To provide oven and table readiness, meats are being bought, cut, and processed by a proved Fazio method. Grocery shelves are being stocked directly from trucks. Frozen food display lockers are being enlarged. More efficient ice manufacture is being utilized. A store modernization program has commenced with improvements begun at ten stores. Losses in sales and income continued and deepened through the first quarter of 1965; but losses in the first eight weeks of the second quarter have been trimmed. The opinion of John Fazio is that, even without the merger, losses will cease by the end of 1966.

These economic benefits, in the nature of ''good will,'' along with the $1,500,000 increase in net worth from the Fazio-Costa corporations, will be brought to Fisher Foods, Inc., and its common shareholders by the merger. All must be balanced against Fisher Foods' assumption of the Union Commerce Bank

loan debt, arising by operation of law, and any dilution of the Fisher common stock by the addition of 410,238 common shares (705,600 new shares less 295,362 retired in the merger).

No evidence was offered to the effect that the decrease in net worth of Fisher common stock, due to Fisher's assumption of the Union Commerce Bank debt by the reason of the merger, should reduce the number of shares issuable to the Fazios and Costas in the merger. Generally to the contrary, Chrystie's testimony is to the effect that the rate of exchange is deemed fair to all the common shareholders. Upon all the evidence, it is found and determined that Fisher's assumption of the Union Commerce Bank debt, weighed as part of the entire merger transaction, damages neither Fisher Foods, Inc., nor its common shareholders.

Another claim to be considered is the petition's contention that:

"said directors violated their fiduciary duties in that said proxy statement was inadequate, incomplete, misleading, unfair and did not fairly and fully inform said shareholders of defendant Fisher of all the material facts; and that by reason thereof, all of such proxies cast in favor of said merger are void and of no effect."

Ohio law does not require a proxy statement in connection with shareholder consideration of a corporate merger transaction. Yet when directors, in connection with a merger transaction, issue a proxy statement it is manifest that their fiduciary duty of full disclosure demands that its language neither misrepresent the material facts, nor mislead the shareholders.

The broad contentions just recited were particularized in only one respect during final argument. Objection is found to that portion of the proxy statement which develops the income base of the Fazio-Costa corporations, and particularly annualization of the income of these corporations from income periods shorter than a fiscal year. In connection with tabularized data, the proxy statement says "Statements for less than a full year have been annualized by simple extension." The fairness of using this income base has already been upheld. Its description in the proxy statement is deemed sufficient.

Typical excerpts from the proxy statement appear in this opinion. In light of all the evidence the proxy statement in its

entirety is found and determined to be adequate. The language used was not misleading and did not misrepresent the material facts of the merger transaction.

Consideration has now been given to each of the major challenges to the merger agreement. It is found and determined, upon all the evidence, that the overall fairness and good faith of the Agreement of Merger have been established by all the evidence.

However there remains the question of fairness to Fisher Foods and its common shareholders of the obligations between Fazio, Costa, and Seaway, operative after the merger is effective, by which Fazio and Costa will sell to Seaway and Kravitz shares at a pegged price of $10 per share. Because this vital issue is raised by the subject matter of the pleadings and by the evidence, this court should decide this issue.

In the Fazio-Costa-Seaway agreement of January 5, 1965, Section 3. *Purchase of Additional Shares by Seaway after Merger* and Section 4. *Sale of Additional Shares by Fazios* contain these main elements.

Subject to financing, and within 30 days after the effectiveness of the merger, Seaway is obligated to buy at $10 per share, and the Fazio and Costa families are obligated to sell "a sufficient number of shares of Fisher common stock so that Seaway will own in the aggregate not less than one hundred and ninety thousand (190,000) shares of Fisher common stock." (Since Seaway originally bought 63,995 shares and later bought 9,500 tendered shares, Seaway is thus obligated to buy 116,505 shares from the Fazios and Costas.)

After completion of the foregoing transaction, if the Fazios still own more than fifty percent (50%) of Fisher common stock then Fazios must make a public offering, provided the net proceeds of the offering is not less than $10 per share.

In the event the public offering is not completed within five months after the effective date of the merger, then within 10 days after the five-month period, Seaway, members of the Costa family, and Kravitz shall have the right, at $10 per share, to buy from the Fazios the number of shares which,

"1. will reduce the Fisher common stock owned by the Fazio family to less than fifty percent (50%), and

"2. will yield proceeds at least equal to the amount, if any, by which (a) One Million Five Hundred Thousand Dollars

($1,500,000) exceeds (b) the aggregate of the proceeds of the sale of the assets of the Fazio partnership pursuant to Section 5 of this agreement and the proceeds from the sales of shares of Fisher common stock by members of the Fazio family pursuant to paragraph A of Section 3 of this agreement."

These obligations peg at $10 per share the price of the shares which, after the merger is effective, are to be sold by the Fazios and Costas to Seaway, and which may be sold by the Fazios to Seaway, Costa, and Kravitz. Ten dollars a share, however, will not be the book value of Fisher common stock after the merger is effective. The book value will then be considerably less. As of December 26, 1964, giving effect to the merger, the proxy statement reported the book value would be $6.51.

After the merger is effective, in the absence of the prearrangement of January 5, 1965, and if as a result of an arm's length negotiation, the Fazios and Costas were to then sell some of their 705,600 shares to Seaway and Kravitz at $10 per share the disparity between that price and a book value per share of $6.51 would not be actionable by Fisher Foods, Inc., or derivatively by its common shareholders. Under such circumstances if Seaway and Kravitz voluntarily chose to pay more than book value, Fazios' and Costas' receipt of $10 per share could be no cause for equitable complaint.

The picture is changed by the prearrangement of January 5, 1965. It pegs the price at $10 per share after the merger is effective; and it obligates the principals to buy and sell sufficient shares to increase Seaway's holdings to 190,000 common shares. This binding agreement is made between the principals, simultaneously with their assumption of full control of Fisher Foods, as directors and common shareholders. Its effect must be judged in relation to the fiduciary duty which they undertook and continue to owe to Fisher Foods and its common shareholders.

As part of the merger transaction Fisher Foods, by operation of law, assumes the Union Commerce Bank debt. This financed the purchase of Fisher common stock by the Fazio-Costa corporations. In the merger transaction the Fazio-Costa stock is increased to 705,600 shares. By reason of the Fazio-Costa-Seaway prearrangement of January 5, perhaps as many as 150,000 of those shares are to be sold between the principals

on the heels of the merger. This sale of stock is so close in point of time to the effectiveness of the merger that its relationship to Fisher Foods' assumption of the stock purchase indebtedness must be scrutinized. This debt of $2,560,580 assumed by Fisher Foods directly contributes to the reduced book value of Fisher common stock. Yet by their receipt of the pegged price of $10 per share (at least $3 in excess of book value) the Fazios are likely to realize, immediately after the completion of the merger, as much as $1,500,000 in cash, and the Costas will realize a smaller amount.

In the totality of this transaction their duty of undivided loyalty will not permit the Fazios and Costas, pursuant to the prearrangement of January 5 with Seaway, to receive the full pegged price of $10 per share for stock sold under this prearrangement, when the stock's then book value will be less, due in part to the Fisher Foods assumption of the Fazio-Costa stock purchase debt.

The evidence does not establish the fairness of the Fazios and Costas, pursuant to prearrangement, receiving the full pegged price of $10 per share sold under this prearrangement. On the contrary, it is found and determined that receipt and retention by the Fazios and Costas, for shares sold pursuant to the prearrangement, of money in excess of the then book value is self-dealing, beneficial to the Fazios and Costas, and financially damaging to Fisher Foods, Inc.

With the prearranged sale of stock by Fazio and Costa occurring after the effectiveness of the Agreement of Merger, this present issue is separable from the previous ruling upholding the Agreement of Merger. Equity will uphold the merger, but can fashion a remedy that will prevent the self-dealing benefits to the Fazios and Costas which are likely to arise.

In view of the imminent sale of stock by Fazios and Costas to Seaway, within 30 days of the effectiveness of the merger under the prearrangement, the impossibility of a legal action ordering payment of monies into Fisher Foods, and with jurisdiction of this cause already assumed in this equitable action, plaintiff's remedy at law is wholly inadequate.

Since the matter now under consideration is separable from the agreement of merger, the appraisal statute, Section 1701.85, Revised Code, does not apply. Moreover this section does not

provide an exclusive remedy. *Johnson* v. *Lamprecht,* 133 Ohio St. 567, and *Schaffner* v. *Iron Co.,* 150 Ohio St. 454.

Upon all the evidence, and in accordance with the foregoing findings and applicable law, it is ordered,

1. An injunction to stop the merger is denied. The Agreement of Merger is valid and enforcible.

2. An injunction shall order and direct Seaway Foods, Inc., and defendant Julie Kravitz, and/or in the alternative, the injunction shall order and direct the individual Fazio defendants and the individual Costa defendants, to pay into Fisher Foods, Inc., whatever sums of money represent the excess over book value per share of all shares sold by the Fazios or Costas to Seaway, and Kravitz, or by Fazios to Costas pursuant to Sections 3 and 4 of the Fazio-Costa-Seaway agreement of January 5, 1965. Book value per share of Fisher common stock shall be fixed as of December 26, 1964, or as of the date of any more current post-merger audited balance sheet of Fisher Foods, Inc.

3. The usual court costs shall be divided between the plaintiff and the defendants. In addition a reasonable attorney's fee for plaintiff's counsel to be fixed by the court, and reflective only of the affirmative relief granted, and the benefit thereby actually realized by Fisher Foods, Inc., shall be taxed against Fazio and Costa defendants. Judgment is rendered accordingly.

*Judgment accordingly.*