615 F.2d 51
 Fed. Sec. L. Rep. P 97,259
Gabriel GALEF, as Trustee of a Trust Created for Bennett G.
Galef, Jr., Plaintiff-Appellant,
v.
J. A. ALEXANDER, C. B. McCoy, G. M. Metcalf, A. W. Reynolds,
J. D. Wright, C. R. Allen, R. F. Bacher, J. T. Brown, R. D.
Delauer, R. F. Mettler, S. C. Pace, S. Ramo, H. A. Shepard,
J. S. Webb, O. Chandler and TRW, Inc., Defendants- Appellees.
 No. 1196, Docket 79-7166.
 United States Court of Appeals,
Second Circuit.
 Argued July 20, 1979.
Decided Jan. 22, 1980.
 
 Sidney L. Garwin, New York City (Bertram Bronzaft, Bruce E. Gerstein, Garwin & Bronzaft, New York City, on brief), for plaintiff-appellant.
 S. Hazard Gillespie, New York City (Sheila T. McMeen, Paul R. Koepff, Davis, Polk & Wardwell, New York City, on brief), for defendants-appellees J. A. Alexander, et al.
 Leo T. Kissam, New York City (Maryan W. Johnson, Kissam, Halpin & Genovese, New York City, on brief), for defendant-appellee TRW, Inc.
 Before VAN GRAAFEILAND, NEWMAN and KEARSE, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 This is an appeal from an order of the District Court for the Southern District of New York, Gerard L. Goettel, Judge, granting defendants' motion for summary judgment in a stockholder's derivative suit on behalf of TRW, Inc. ("TRW"), an Ohio corporation, raising claims under § 14(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78n(a) (1976) ("1934 Act"), and under state law. The gravamen of the complaint is that defendant directors of TRW exceeded their authority under certain employee stock option plans by causing the granting of options in 1974 conditioned on the surrender of other options previously granted at higher exercise prices; that the proxy statements issued to secure approval of the stock option plans violated § 14(a) in that they failed to disclose the possibility of such conditional grants; and that subsequent proxy statements seeking the election of directors violated § 14(a) by failing to disclose that certain directors had personally benefited from the conditional grants.
 
 
 2
 A majority of TRW's board of directors, consisting of those directors who did not receive options, has determined that maintenance of this action would be contrary to the best interests of the corporation. The district court ruled that this determination was conclusive under the "business judgment" rule, and required dismissal of the action. We hold that appellant's claims under § 14(a) were not subject to dismissal under the business judgment rule, and that the dismissal of the state law claims under that rule must be reconsidered with reference to Ohio law. Accordingly, we reverse and remand for further proceedings.
 
 
 3
 * The Plans and the Grants
 
 
 4
 In 1967 the stockholders of TRW approved an employee stock option plan which authorized the issuance and sale of 700,000 shares[1] of TRW stock. The options granted under the plan were intended to serve as a form of incentive compensation to officers and "key employees" of the company. The plan is administered by a Stock Option Committee (the "Committee"), which at all relevant times has consisted of four outside directors of TRW. Under the plan, the Committee may authorize the granting of options "upon such terms and conditions as it may determine,"[2] at exercise prices not lower than the fair market price of the stock at the time of the grant. Except in circumstances not present here, the plan does not provide that the exercise price of outstanding options may be reduced. The plan does not give the board of directors or the Committee authority to amend or modify any of its provisions.
 
 
 5
 By 1973, options had been granted covering all but 64,877 of the 700,000 shares authorized under the 1967 plan. In 1973 the stockholders approved a second stock option plan, authorizing the issuance and sale of 800,000 shares, which, in all material respects other than the number of shares, was identical to the 1967 plan.
 
 
 6
 Between 1971 and 1974 the market price of TRW stock declined substantially. The stock traded during 1971 and 1972 at varying levels between $30 and $40, but by December 31, 1973 the price had fallen to less than $18. Options that had been granted at earlier market prices consequently went "underwater" i. e., the exercise price was well above the current market price of the stock and these options were thus of little or no value to the employees who had received them. The directors apparently perceived this as a serious threat to employee morale because during the period of market price decline, the company's general earnings trend, in part due to the efforts of the optionees, had been positive. Thus, the purpose for which the options had been granted to provide incentive compensation was defeated.
 
 
 7
 In 1974 the Stock Option Committee therefore decided to replace the "underwater" options with new options carrying lower exercise prices. On May 1, 1974, employees holding options granted prior to December 31, 1972 were given new options, which by their terms would expire in 60 days unless options granted prior to 1973 covering an equivalent number of shares were surrendered for cancellation. The new options carried new "earn-out" provisions and did not give credit for employment prior to May 1, 1974 or for previous earn-out periods accumulated by an optionee in connection with the surrendered options.[3] As a result of these grants, old options covering 564,928 shares with exercise prices of $28.75-$37.625 were surrendered and were replaced by new options covering the same number of shares and exercisable at $18. The new grants covered 551,928 shares that were available under the 1973 plan and 13,000 shares that were available under the 1967 plan.
 
 
 8
 After May 1, the market price of TRW stock continued to decline. On October 1, 1974, the Committee issued new options covering 306,430 shares which were conditioned on the surrender of options that had been granted during 1973. The October grants covered shares then available under the 1967 plan, all, or nearly all, of which had become available as a result of the surrender of options pursuant to the May grants. The October options had an exercise price of $13.56, and replaced options that had been exercisable at prices ranging from $24.875 to $27.625.
 
 
 9
 As a result of the May and October 1974 grants, six officer-directors received new options covering 174,300 shares, or 20% of the total granted, exercisable at an aggregate price of $2,862,120, in exchange for the surrender of options to purchase the same number of shares at an aggregate price of $5,027,188.[4] In plaintiff's view the principal reason for the 1974 grants was to permit these six recipient-directors to profit unfairly from a temporary decline in the market price of TRW stock.
 
 The Complaint
 
 10
 Plaintiff filed suit against all fifteen of TRW's directors on May 16, 1976, challenging the 1974 grants and various proxy statements issued before and after. Jurisdiction was predicated on § 27 of the 1934 Act[5] and on diversity of citizenship.[6] The complaint asserted principally that the grants were invalid because they were, in effect, unauthorized reductions in the exercise prices of existing options, and because the share limitation in the 1967 plan had been exceeded. It charged that the recipient-directors and the members of the Stock Option Committee had breached their fiduciary duties to the corporation, and that the other directors were responsible for having acquiesced in the invalid grants.
 
 
 11
 In addition, plaintiff charged that five proxy statements violated § 14(a) of the 1934 Act[7] and Rule 14a-9 promulgated thereunder[8] because of alleged nondisclosure of facts relating to the 1974 grants.[9] The 1967 and 1973 proxy statements urging stockholder approval of the 1967 and 1973 plans were attacked as false and misleading, principally on the ground that they did not disclose the possibility of conditional grants, such as those made in 1974, that could be used to reduce the exercise prices of outstanding options. The 1974 proxy statement for the annual meeting at which certain directors were elected was challenged on the ground that the board of directors had determined to implement the May conditional grants but failed to disclose that determination, with the result that certain directors were to receive more remuneration than was disclosed in the proxy statement.[10] Finally, the proxy statements for the 1975 and 1976 annual meetings at which directors were elected, although they listed the number of options and the average per-share option price for each director, were attacked for not disclosing that these options had replaced older, higher-priced options as a result of the 1974 grants.
 
 
 12
 In redress of his state law claims, plaintiff sought rescission of the 1974 grants and demanded that the defendant directors account for any losses to the corporation resulting from those grants. On his § 14(a) claims plaintiff demanded that the 1967 and 1973 plans be declared void, and that the elections of directors in 1974, 1975 and 1976, be set aside.
 
 
 13
 The Directors' Resolution Concerning Plaintiff's Suit
 
 
 14
 The directors of TRW received reports on plaintiff's lawsuit at their July 1976 and October 1976 meetings. They received a written memorandum of the background of the 1974 conditional grants and regrants from TRW's general counsel, who was a recipient of the 1974 grants. They instructed TRW's outside counsel to investigate the merits of the claim that the conditional grants and regrants were invalid, and obtained a reconfirmation of that firm's original opinion that the grants and regrants were valid.
 
 
 15
 On December 15, 1976, the board met with two additional independent law firms to discuss the action. Each of those firms gave its opinion that the 1974 grants were valid and that the TRW board could authorize counsel to seek dismissal of this suit. Following some discussion, the six directors who had received options under the 1974 grants were excused from the meeting. According to the defendants' affidavits, which were credited by the district court, the remaining nine directors concluded that the best interests of the company required dismissal of the action; they believed the 1974 option grants were valid, that the pursuit of the lawsuit would have a detrimental effect on the morale of key employees by creating uncertainty as to the validity of their options, and that if plaintiff succeeded in his quest to have the 1974 options cancelled, TRW would be injured by the demoralization of the key employees. Consequently, the nine directors voted to authorize counsel to seek dismissal of the action as contrary to the best interests of the corporation.
 
 The Motions and Decision Below
 
 16
 Following this resolution by the nine TRW directors, but prior to its implementation, plaintiff sought discovery on the merits of his claims. On March 25, 1977, TRW and its directors moved for summary judgment under Fed.R.Civ.P. 56 dismissing the entire action, on the ground that the independent directors of the company had determined that it would not be in the company's best interests to pursue any of the claims asserted in the complaint, and moved for dismissal of the 1934 Act claims under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted. They followed with a motion, which was granted, to limit discovery to issues of the good faith of the nine directors in their exercise of business judgment to seek dismissal.[11] There ensued ten months of discovery including depositions of eight of the nine directors,[12] and the TRW general counsel.
 
 
 17
 Following this discovery, the defendants renewed their motion for summary judgment and dismissal. In addition to complaining of a lack of discovery on the merits, plaintiff took the position that, for various reasons, none of the nine directors was independent: three had approved the 1974 grants as members of the Stock Option Committee; and plaintiff charged six directors with causing to be issued the 1967 and 1973 proxy statements, eight with causing to be issued the 1974 and 1975 proxy statements, and all nine with causing to be issued the 1976 proxy statement. All of the directors voting had been elected pursuant to the 1974, 1975 or 1976 proxy statements. Plaintiff suggested further that the directors could not be considered independent because they were defendants to the lawsuit.
 
 
 18
 After a hearing, the district court granted summary judgment on the basis of the business judgment rule. In its opinion, the district court focused principally on the state law claims. It declined to make findings as to the merits of these claims, but reasoned that a preliminary assessment of the merits would shed light on the question whether the directors had acted in good faith. The court proceeded to examine the state law claims at some length and concluded that they had little merit. The court found no evidence of fraud or conflict of interest on the part of the nine TRW directors, and rejected plaintiff's contention that a director is interested in a claim merely by virtue of having been made a defendant to the action. Hence the court found that a disinterested majority of TRW's board had acted independently and in good faith in voting to seek dismissal.
 
 
 19
 Turning to the § 14(a) claims, the court stated:The plaintiff alleges additionally a number of proxy violations. The alleged violations which are of any substance are premised on the contention that the granting of the 1974 options was unauthorized or illegal. In light of the foregoing analysis (of the state law claims), which supports the defendants' claim that their actions were justified and reasonable with regard to the new option grants, a discussion of the alleged disclosure violations is unnecessary. It is sufficient to state that in light of the underlying merits of the plaintiff's allegations, a decision by a board of directors not to pursue such an action could be reasonable under objective standards.
 
 
 20
 (A.855-56.)
 
 
 21
 The district court entered judgment dismissing the complaint, and this appeal followed.
 
 II
 
 22
 The management of a corporation is normally entrusted to its board of directors. The directors have responsibility for such matters as setting the policies of the corporation, deciding what contracts the corporation will enter into, determining what compensation will be adequate, and deciding how, generally and specifically, it will seek to reach its goals. In carrying out these responsibilities, the directors are left solely to their own honest and unselfish judgment, and if they exercise that judgment without fraud and free of conflicts of interest, they are not second-guessed by the courts. The doctrine that bars judicial inquiry into actions of directors taken in good faith and in honest pursuit of the legitimate purposes of the corporation is called the "business judgment" doctrine. See, e. g., 3A Fletcher, Cyclopedia of the Law of Private Corporations, § 1039 (perm. ed.1975);[13] Auerbach v. Bennett, 47 N.Y.2d 619, 629, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979).
 
 
 23
 Among other business decisions, the directors have responsibility for determining whether or not to pursue causes of action available to the corporation. The recognition of this responsibility, and the application to it of the business judgment doctrine have led to the rule that in general a court should not entertain a derivative action where a disinterested majority of the board has determined, in the good faith exercise of its business judgment, that the suit is not in the best interests of the corporation. See United Copper Securities Co. v. Amalgamated Copper Co., 244 U.S. 261, 263-64, 37 S.Ct. 509, 510, 61 L.Ed. 1119 (1917):
 
 
 24
 Whether or not a corporation shall seek to enforce in the courts a cause of action for damages is, like other business questions ordinarily a matter of internal management, and is left to the discretion of the directors, in the absence of instruction by vote of the stockholders. Courts interfere seldom to control such discretion intra vires the corporation, except where the directors are guilty of misconduct equivalent to a breach of trust, or where they stand in a dual relation which prevents an unprejudiced exercise of judgment . . ..
 
 
 25
 The principle that disinterested directors may prevent pursuit of a claim of the corporation in a stockholder derivative action is itself referred to as the business judgment rule. It is this rule that is involved in the present action.
 
 
 26
 Directors may seek to invoke the business judgment rule to prevent pursuit of a claim in any of a great variety of circumstances, and the fundamental question is whether the particular claim in the circumstances given is one whose pursuit directors have the power to prevent. A preliminary question, however, is what body of law governs the issue of whether or not the power exists. As we will develop below, state law usually governs the existence of the power, Swanson v. Traer, 354 U.S. 114, 77 S.Ct. 1116, 1 L.Ed.2d 1221 (1957); Burks v. Lasker, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979), although the question whether the power may be exercised to bar pursuit of a particular claim will, in some circumstances, depend on whether the claim was created by state law or by federal law.
 
 
 27
 It does not appear to us that the district court considered the choice of law question or, perforce, that it analyzed the impact on that question of the policies underlying § 14(a) of the 1934 Act.
 
 A. The State Law Claims
 
 28
 It is now well established that in an action brought in a federal district court on the basis of diversity of citizenship, questions of whether or not a stockholder may bring a derivative action are governed by state law. Swanson v. Traer, supra, 354 U.S. at 116, 77 S.Ct. at 1118:
 
 
 29
 As we stated in Smith v. Sperling, (354 U.S. 91, 77 S.Ct. 1112, 1 L.Ed.2d 1205), since our decision in Erie R. Co. v. Tompkins, 304 U.S. 64 (58 S.Ct. 817, 82 L.Ed. 1188), the question whether in these diversity suits a stockholder may sue on behalf of his corporation is governed by local law.
 
 
 30
 In a diversity action the conflict of laws principles of the forum state, here New York, determine what laws govern the substantive question of the stockholder's right to sue. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Hausman v. Buckley, 299 F.2d 696, 700-02 (2d Cir. 1962). It appears that the New York courts would look to the law of the state of incorporation in adjudicating a corporation's "internal affairs," including questions as to the relationship between the corporation's shareholders and its directors. See Hausman v. Buckley, supra, 299 F.2d at 702-06; Russian Reinsurance Co. v. Stoddard, 240 N.Y. 149, 154, 147 N.E. 703 (1925); Greenspun v. Lindley, 36 N.Y.2d 473, 478, 369 N.Y.S.2d 123, 330 N.E.2d 79 (1975) (dictum); Rottenberg v. Pfeiffer, 59 A.D.2d 756, 398 N.Y.S.2d 703 (2d Dep't 1977), motion for leave to appeal granted, 44 N.Y.2d 642, 405 N.Y.S.2d 1025, 376 N.E.2d 934 (1978); Newman v. Baldwin, 13 Misc.2d 897, 179 N.Y.S.2d 19 (Sup.Ct.N.Y.Co.1958); cf. Diamond v. Oreamuno, 24 N.Y.2d 494, 503-04, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969). Since TRW is an Ohio corporation, Ohio law determines the effect of the business judgment resolution of the TRW directors on plaintiff's state law claims.[14]
 
 
 31
 The district court in the present case approached the business judgment question from the standpoint of whether or not the nine TRW directors were "interested" in the state law claims attacking the validity of the conditional option grants and re-grants. The court found that the directors who authorized the motion to dismiss were not interested in those claims because they were not recipients of the grants. Since these nine had no financial stake in the options transactions underlying the suit, the court rejected contentions by the plaintiff that they were not sufficiently independent because they had been made defendants to the suit challenging the grants, or because some of them had approved the 1974 grants. The court stated:
 
 
 32
 Indeed, the business judgment rule would be meaningless if it were invalid any time the underlying transaction had been approved by the board, whose members were, as a consequence, named defendants. If that were the rule, any time board action was involved, simply by naming the company's directors as defendants, the business judgment rule would be rendered inoperable.
 
 
 33
 (A.858-A.859.) None of the authorities, however, compels this conclusion.
 
 
 34
 The question whether directors are "interested" in a claim has frequently arisen in the context of a determination of whether or not the plaintiff has complied with Fed.R.Civ.P. 23.1, and the district court relied in part on this class of cases. Rule 23.1 requires that a complaint in a derivative action allege with particularity the attempts the plaintiff has made to have the directors of the corporation bring the suit; if the plaintiff has not obtained the action desired from the directors, the complaint must detail the reasons for the plaintiff's failure to obtain such action or for his failure to make the attempt. Frequently, a plaintiff's effort to comply with Rule 23.1 will consist of allegations that the directors have refused to act or that it would have been futile to ask them to act, because they have an interest in the subject matter of the lawsuit. There are thus two groups of cases in which a court must make a preliminary evaluation of the directors' interest: those in which there has been no demand,[15] e. g., In re Kauffman Mutual Fund Actions, 479 F.2d 257 (1st Cir.), cert. denied, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973); Brooks v. American Export Industries, Inc., 68 F.R.D. 506 (S.D.N.Y.1975); and those in which there has been a demand that has been rejected, e. g., Bernstein v. Mediobanca Banca di Credito Finanziario-S.p.A., 69 F.R.D. 592 (S.D.N.Y.1974).
 
 
 35
 Cases of the first sort, i. e., those in which there has been no demand, do not answer the question presented here. Rule 23.1, which reflects the generally prevailing state law requirements that a demand be made on directors,[16] is essentially a requirement that a stockholder exhaust his intracorporate remedies before bringing a derivative action. If the court agrees with the stockholder's contention that a demand on directors would have been futile, it will deem the intracorporate remedies exhausted and will thus excuse the failure to make the demand. E. g., Cathedral Estates, Inc. v. Taft Realty Corp., 228 F.2d 85 (2d Cir. 1955); 3B J. Moore, Federal Practice P 23.1.19, at 23.1-83 to 23.1-90 (2d ed. 1979); 7A C. Wright & A. Miller, Federal Practice & Procedure, § 1831, at 378-81 (1972). If the court believes a demand would not necessarily have been futile, the stockholder is, at least temporarily, barred from proceeding with the suit. The decision as to whether a demand is excusable, however, does not necessarily answer the question presented here, of whether a resolution by directors to seek summary termination of the suit should be honored. If, on the one hand, it were determined that the directors were so interested that a demand on them would be futile, one would expect the applicable body of corporation law not to deem those directors disinterested for purposes of initiating a business judgment dismissal. But the converse is not necessarily true. A determination that directors are not so interested in the underlying transaction as to excuse demand on them does not mean that they are so disinterested as to enable them to eliminate the lawsuit. The rationale of the cases holding that demand must be made even if the directors have been or may be made defendants, is not that the directors can preclude suit despite being defendants, but rather that they might cause the corporation to pursue the suit despite being defendants. See In re Kauffman Mutual Fund Actions, supra, 479 F.2d at 265; Brooks v. American Export Industries, Inc., supra, 68 F.R.D. at 511; Comment, The Demand and Standing Requirements in Stockholder Derivative Actions, 44 U.Chi.L.Rev. 168, 178-79 (1976). Thus, in In re Kauffman Mutual Fund Actions, where certain directors were charged with having acquiesced, encouraged, cooperated, and assisted in the challenged practice, the majority opinion stated:
 
 
 36
 It does not follow . . . that a director who merely made an erroneous business judgment in connection with what was plainly a corporate act "will refuse to do (his) duty in behalf of the corporation if (he) were asked to do so."
 
 
 37
 479 F.2d at 265 (emphasis added). Similarly, in Brooks v. American Export Industries, in which all directors were made defendants, the court pointed out that because of the failure to make a demand, the directors in question had never been given "the opportunity" to sue. 68 F.R.D. at 511.
 
 
 38
 Cases of the second type, in which the plaintiff stockholder has made a demand on the directors which has been rejected, are structurally closer to the case at hand, because the business decision not to have the corporation's claim pursued has been made and is known, and the question is whether that decision will be treated as definitive. The answer to this question, however, varies according to the circumstances, and the test is generally stated to be whether the directors "stand in a dual relation which prevents an unprejudiced exercise of judgment." United Copper Securities Co. v. Amalgamated Copper Co., supra, 244 U.S. at 264, 37 S.Ct. at 510; see Ash v. International Business Machines, Inc., 353 F.2d 491, 493 (3d Cir. 1965), cert. denied, 384 U.S. 927, 86 S.Ct. 1446, 16 L.Ed.2d 531 (1966); Gall v. Exxon Corp., 418 F.Supp. 508, 515 (S.D.N.Y.1976); Bernstein v. Mediobanca Banca di Credito Finanziario-S.p.A., supra, 69 F.R.D. at 596. All of the cases relied on by the district court, in which a stockholder demand has been refused and the refusal has been held dispositive, have arisen in circumstances different from those at bar. In each case, the court has indeed allowed directors to preclude pursuit of a corporate claim, but in each the directors who made such a determination were not alleged to have authorized or approved the challenged transaction, and they were not made defendants to the lawsuit.[17] We are not aware of any case that has determined that directors against whom a claim has been asserted and who have determined that the claim against them should not be pursued, do not "stand in a dual relation which prevents an unprejudiced exercise of judgment."[18] Indeed, the Eighth Circuit has opined, obiter, that "where the directors, themselves, are subject to personal liability in the action (they) cannot be expected to determine impartially whether it is warranted." Abbey v. Control Data Corp., 603 F.2d 724, 727 (8th Cir. 1979) (emphasis added), cert. denied, --- U.S. ----, 100 S.Ct. 670, 62 L.Ed.2d 647 (1980), and one district court has termed it
 
 
 39
 inconceivable that directors who participated in and allegedly approved of the transaction under attack can be said to have exercised unbiased business judgment in declining suit based on that very transaction.
 
 
 40
 Nussbacher v. Chase Manhattan Bank, 444 F.Supp. 973, 977 (S.D.N.Y.1977).[19]
 
 
 41
 Most important, none of these authorities discloses what the answer to the question confronting us would be under the laws of Ohio. It may be that under Ohio law a director's being sued merely on account of having authorized, without financial interest, the underlying transaction does not make him sufficiently "interested" to deprive him of the power to initiate a business judgment summary dismissal of the suit. But such a rule is hardly trumpeted by the three Ohio cases cited to us: Roderick v. Canton Hog Ranch Co., 46 Ohio App. 475, 189 N.E. 669 (1933); Cooper v. Central Alloy Steel Corp., 43 Ohio App. 455, 183 N.E. 439 (1931); Rice v. Wheeling Dollar Savings & Trust Co., 71 Ohio Abs. 205, 130 N.E.2d 442 (Ct.C.P.1954). In Rice v. Wheeling Dollar Savings & Trust Co., the court gave effect to a resolution opposing a lawsuit, passed by directors who were not alleged to have participated in the alleged wrongdoing and were not made parties to the lawsuit:
 
 
 42
 No member of this board was directly or indirectly a party to or in any way involved in any of the wrongs alleged by the plaintiffs. There is no showing that their decision was anything but the exercise of a considered and unbiased judgment.
 
 
 43
 130 N.E.2d at 448. Roderick v. Canton Hog Ranch Co., supra, held that demand on the directors who were not sued, and were charged with no wrongdoing, was not excused. Noting that the plaintiff had alleged mere "supine acquiescence" by the directors in the president's waste and mismanagement, the court stated as follows:
 
 
 44
 And, in view of the lack of averment that the board of directors have participated in the fraud charged against Quigley, and that they are not charged with any wrongdoing, and that they are not called upon to account, and that they would not be called upon to order the corporation to sue themselves, we hold that demand was not a futile and vain thing and that the means existed within the corporation itself to procure redress of the wrongs claimed . . .; and, there being such a remedy extant, equity must not intervene until such remedies are exhausted.
 
 
 45
 189 N.E. at 672 (emphasis added).
 
 
 46
 It might be inferred from the emphasized portion of the Roderick opinion that an Ohio court would deem it a futility to demand that directors have the corporation sue them, and consider a summary dismissal of a suit against them to be unavailable. Indeed, two years earlier the same panel had decided Cooper v. Central Alloy Steel Corp., supra, in which the complaint did in fact name individual directors as defendants after the directors had refused a demand to bring suit. In Cooper, the court chose not to dismiss summarily in deference to the directors' refusal, and instead considered the merits of the underlying controversy. 183 N.E. at 442. Nonetheless, after ruling for the defendants on the merits on the ground that they had "fully shown that the contract was fair and free of taint of fraud," the court suggested that the merits perhaps need not have been reached in order to dismiss plaintiff's claim:
 
 
 47
 (T)esting the facts in this case by the severest test, by casting on the defendants the burden of showing that the transactions were fair and free of taint of fraud, which we do not hold or find to be the rule in this state, we reach the opinion that the defendants have fully and completely refuted the charges made and overcome the burden perhaps unjustly imposed upon them by this court.
 
 
 48
 Id. at 445 (emphasis added).
 
 
 49
 We think it safe to say that the answer to the question presented in the case at bar is not clear from the cases cited to us on appeal. And we gather that Ohio law was not argued at all to the district court. The question of the availability of a business judgment summary dismissal to TRW's nine defendant directors is therefore remanded for reconsideration in the context of a more complete exploration of Ohio law.
 
 B. The Section 14(a) Claims
 
 50
 Even if Ohio law had been found generally to permit directors who have been sued to initiate a business judgment summary dismissal of the suit against them, serious questions would persist with respect to the nine TRW directors' attempt to cause such a dismissal of the § 14(a) claims. When a federal statute has condemned conduct as unlawful, the legal consequences of that condemnation and the extent to which state law principles may affect the condemnation are questions of federal law, and the answers must be sought in the policies that underlie the federal statute. Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 176, 63 S.Ct. 172, 87 L.Ed. 165 (1942); Burks v. Lasker, supra, 441 U.S. at 476-77, 99 S.Ct. 1831.
 
 
 51
 In Burks v. Lasker, the Supreme Court considered whether five disinterested, non-defendant directors of an investment company could cause the business judgment dismissal of a derivative suit alleging breach of statutory and common law duties in connection with the purchase by the company of certain commercial paper which subsequently declined in value. The Court first held that the applicability vel non of the business judgment rule to the federal claims is itself a question of federal law, id. at 475-77, 99 S.Ct. 1831, although the precise content of the business judgment rule depends upon the powers that corporate directors are given, and "the first place one must look to determine the powers of corporate directors is in the relevant State's corporation law." Id. at 478, 99 S.Ct. at 1837, citing Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 479, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), and Cort v. Ash, 422 U.S. 66, 84, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). The Court concluded that state law should be applied to the business judgment issue "unless the state laws permit action prohibited by the (federal statute), or unless 'their application would be inconsistent with the federal policy underlying the cause of action.' " 441 U.S. at 479, 99 S.Ct. at 1837. And the Court admonished that "federal courts must be ever vigilant to insure that application of state law poses 'no significant threat to any identifiable federal policy or interest . . .'." Id., 99 S.Ct. at 1838. Thus, in the present case a determination would be required as to whether an Ohio business judgment rule such as that hypothesized above would be inconsistent with the prohibition in § 14(a), and the regulations thereunder, against use of false, misleading or deceptive statements in the solicitation of proxies.
 
 
 52
 Most shareholders do not participate in the management of their corporation. Those who do not usually have little independent access to material facts relating to the business and operations of the corporation. As part owners of the corporation, however, they have a final say on important matters such as who becomes a director entrusted to manage the corporation, or whether a merger is to take place, or whether additional capital stock is to be authorized. If shareholders are to vote prudently on such matters, they must be given information that is adequate for them to reach a reasoned decision. Section 14(a) and the regulations promulgated thereunder are designed to secure such information for the shareholders and to ensure that no material facts are omitted. No one, neither the managers of the corporation nor those out of control who would like to direct its affairs, is permitted to make statements that tamper with the truth in soliciting a shareholder's proxy. In J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), the Supreme Court described the policies underlying the section as follows:
 
 
 53
 The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation. The section stemmed from the congressional belief that "(f)air corporation suffrage is an important right that should attach to every equity security bought on a public exchange." H.R.Rep.No.1383, 73d Cong., 2d Sess., 13. It was intended to "control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which . . . (had) frustrated the free exercise of the voting rights of stockholders." Id., at 14. "Too often proxies are solicited without explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought." S.Rep.No.792, 73d Cong., 2d Sess., 12. These broad remedial purposes are evidenced in the language of the section which makes it "unlawful for any person . . . to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security . . . registered on any national securities exchange in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." (Italics supplied.)
 
 
 54
 Id. at 431-32, 84 S.Ct. at 1559.
 
 
 55
 In Borak, the Court held that, in addition to the individual private right of action for violation of § 14(a) found to exist under § 27 of the 1934 Act, a derivative right of action must be inferred. The Court observed that in many instances derivative actions may be the only means of private redress for a violation of § 14(a), and reasoned that denying a derivative right of action would be tantamount to denying a type of enforcement that is essential to the accomplishment of the goals of § 14(a). 377 U.S. at 432, 84 S.Ct. 1555. Describing the fundamental character of a claim of proxy violation as "federal", and its importance as sometimes "overriding" that of otherwise applicable state law, the Court observed that "if the law of the State happened to attach no responsibility to the use of misleading proxy statements, the whole purpose of the section might be frustrated." Id. at 434-35, 84 S.Ct. at 1561.
 
 
 56
 The role of management in educating the stockholder sufficiently to allow him to cast an intelligent vote is unique. Those managing the corporation have the greatest access to relevant factual information. They have most clearly in mind the corporation's long-range plans. These factors and the directors' status as fiduciaries usually cause stockholders to give statements from management greater weight than they accord to the statements of corporate dissidents. Obviously the goal of § 14(a) that communications from management be accurate and complete as to all material facts is a vital one. Its achievement would quite clearly be frustrated if a director who was made a defendant in a derivative action for providing inadequate information in connection with a proxy solicitation were permitted to cause the dismissal of that action simply on the basis of his judgment that its pursuit was not in the best interests of the corporation. The very premises which give life to a derivative right of action to enforce § 14(a) must save it from a premature death. In short, we conclude that to the extent that a complaint states claims against directors under § 14(a) upon which relief may be granted, federal policy prevents the summary dismissal of those claims pursuant to the business judgment of those defendant directors.
 
 
 57
 The conclusion that well pleaded § 14(a) claims against directors are not subject to summary dismissal on the basis of their exercise of business judgment makes unnecessary further study of what powers Ohio law would grant with respect to the § 14(a) claims. To the extent that Ohio law would classify any director who is a defendant as "interested," and thus without power to initiate a business judgment dismissal of a derivative action, the business judgment rule would not be available to defeat a § 14(a) claim; to the extent that Ohio law would consider disinterested some defendant directors against whom claims were asserted, or to the extent that it would permit even interested directors to initiate a business judgment dismissal, Ohio law would yield to federal policy.[20]
 
 
 58
 The holding in Burks v. Lasker, supra, does not require a different result. The five directors who exercised the business judgment in Burks "were 'disinterested' within the meaning of the Investment Company Act," 441 U.S. at 474 n.4, 99 S.Ct. at 1835 n.4, and were not sued; the Court held that state law would govern the availability of a business judgment dismissal only if it eventually were determined that state law did not conflict with the federal statutory policy. The Court's conclusion that the policies of the Investment Company Act "hardly justify a flat rule that directors may never terminate nonfrivolous derivative actions involving co -directors," id. at 481-82, 99 S.Ct. at 1839 (emphasis added), does not imply that directors may terminate nonfrivolous derivative actions under § 14(a) against themselves.
 
 
 59
 In the present case, plaintiff alleges that the proxy regulations have been violated by the defendant directors in a number of ways. Although TRW and the directors moved to dismiss the § 14(a) claims under Rule 12(b)(6), as well as moving for summary judgment on the entire complaint, the district court did not reach this branch of their motion. While we do not consider here all of the assertions of proxy violations found in the complaint, we cannot conclude that all of plaintiff's § 14(a) claims are subject to dismissal under Rule 12(b) (6). For example, we cannot reject out of hand the possibility of plaintiff's establishing a claim based on the 1973 proxy statement's representation, in support of the proposed issuance of 800,000 new shares for options, that only 64,877 shares remained available for options under the 1967 plan. We tend to agree with the district court's view that a stockholder is concerned about the total number of shares that may be issued to dilute his interest rather than about the number of options that may be granted with respect to a constant total number of shares. However, a shareholder could have been influenced to vote authorization for the additional 800,000 shares for the 1973 plan on the premise that either (a) the options already granted but unexercised under the 1967 plan would probably never be exercised because they were underwater, and the 1967 unexercised options would therefore be an unlikely source of dilution, or (b) if the 1967 options were eventually exercised, the exercise price would be sufficiently high that the total dilution from those grants and the new grants to be authorized in 1973 would be worthwhile. If the directors, prior to the issuance of the 1973 proxy statement in support of the new 800,000-share plan, had already decided to retrieve options granted under the 1967 plan and regrant them at a later time at lower prices,[21] it would be possible to conclude that the bare representation in the proxy statement as to the actual number of shares then available for option under the 1967 plan was incomplete and misleading. We can envision a number of factual issues that may exist[22] but these issues do not make the pleading defective.
 
 
 60
 Nor can we reject on the basis of the pleadings plaintiff's attempt to void the elections of directors that occurred in 1974, 1975 and 1976 because of claimed violations of proxy regulation requirements with regard to disclosure of certain directors' remuneration resulting from the 1974 grants. Defendants argue that these claims do not meet the causation requirement of § 14(a), see, e. g., Mills v. Electric Auto-Lite Co., 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), because the votes did not "cause" the 1974 conditional grants. But the injuries of which plaintiff complains in these claims are the elections themselves: he seeks to have the elections overturned on account of alleged nondisclosure of certain directors' remuneration. Since remuneration may be a matter of especial interest in the election of directors, and is indeed the subject of special regulations under § 14(a), see, e. g., note 9 supra, there appears to be alleged a sufficient causal link between the claimed nondisclosures in the proxy statements and the elections which the statements sought to influence. See Maldonado v. Flynn, supra; see also Weisberg v. Coastal States Gas Corp., 609 F.2d 650 (2d Cir. 1979). Again, the facts may belie the claim,[23] but the pleading appears to be adequate.
 
 III
 
 61
 Our ruling that the well pleaded § 14(a) claims here are not subject to business judgment dismissal does not mean that a plaintiff may forestall an otherwise available business judgment dismissal of state law claims merely by asserting claims against the directors under § 14(a). If, for example, the directors voted to seek a business judgment dismissal of only the state law claims, leaving the federal claims to be adjudicated, and if the applicable state law deemed the directors to be sufficiently disinterested in the state law claims to initiate such a dismissal, partial summary judgment on this basis would be permissible. Alternatively, if the complaint failed to state a claim against the directors upon which relief could be granted under § 14(a), dismissal of the § 14(a) claims under Rule 12(b)(6) would be appropriate, and the state law claims, assuming the district court had diversity jurisdiction or chose to exercise pendent jurisdiction, would be subject to summary dismissal on the basis of the business judgment rule.[24] Or, if the § 14(a) claims defied Rule 12(b)(6) dismissal but were vulnerable to summary judgment on the merits under Rule 56, a business judgment dismissal of the state law claims could be appropriate after or contemporaneously with the summary judgment on the federal claims.
 
 
 62
 The propriety in the present case of a business judgment summary dismissal limited to the state law claims, assuming an Ohio rule allowing defendant directors to cause a summary dismissal, is beclouded by the viability of some § 14(a) claims and the scope of the nine directors' business judgment resolution. Although there may be a question as to the precise focus of the nine directors' business judgment deliberations, it is clear that their decision was to seek business judgment dismissal of the entire action rather than of just the state law claims. We are thus left with a question as to whether their seeking the dismissal of federal claims in which they were interested along with state law claims in which, by hypothesis, they were not interested may have tainted their judgment on the latter claims. On the other hand, their motion to dismiss the § 14(a) claims under Rule 12(b)(6) can be viewed as evincing a belief that there were no serious federal claims against them. The question whether a partial dismissal, limited to the state law claims, is permissible in these circumstances must be decided with reference to Ohio law.
 
 
 63
 We reverse and remand for proceedings not inconsistent with this opinion.
 
 
 
 [1]
 The plan originally covered 350,000 shares, but this figure was doubled after a stock split in 1968
 
 
 [2]
 The plan elsewhere provides: "Each option shall contain such other terms and conditions not inconsistent herewith as shall be approved by the Stock Option Committee." (Joint Appendix ("A.") 210.)
 
 
 [3]
 Subject to special exceptions relating to the death, disability or retirement of an optionee, the new options could not be exercised until after one year of employment after May 1, 1974, and could be exercised only to the extent of one-fourth of the total number of shares for each year of employment after May 1, 1974
 
 
 [4]
 Options granted in May and October 1974 covering the remaining 684,058 shares went to several hundred other "key" employees
 
 
 [5]
 Section 27 of the 1934 Act, 15 U.S.C. § 78aa (1976), provides in part as follows:
 The district courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder.
 
 
 [6]
 It appears that we are intended to infer that plaintiff is a citizen of New York, for the complaint alleges that all of the defendants are citizens of states other than New York (P 3(f)) and that there is diversity of citizenship (P 3(d)). The answers, although they deny knowledge of whether the court has diversity jurisdiction, admit that all of the defendants are citizens of states other than New York
 
 
 [7]
 Section 14(a) of the 1934 Act, 15 U.S.C. § 78n(a) (1976), provides:
 It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.
 
 
 [8]
 Rule 14a-9, 17 C.F.R. § 240.14a-9 (1979), provides in part:
 (a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.
 
 
 [9]
 On this appeal plaintiff has not relied on claims asserted in the complaint under Rule 106-5 promulgated under the 1934 Act
 
 
 [10]
 Plaintiff also asserted that the 1974 proxy statement failed to comply with Rule 14a-3, 17 C.F.R. § 240.14a-3, and with Schedule 14A, item 7(f), 17 C.F.R. § 240.14a-101, item 7, then in effect, which required disclosure of "presently proposed transactions" between the issuer and its officers and directors:
 (f) Describe briefly any transactions since the beginning of the issuer's last fiscal year or any presently proposed transactions, to which the issuer or any of its subsidiaries was or is to be a party, in which any of the following persons had or is to have a direct or indirect material interest, naming such person and stating his relationship to the issuer, the nature of his interest in the transaction and, where practicable, the amount of such interest:
 (1) Any director or officer of the issuer;
 (2) Any nominee for election as a director;
 Instructions. 1. No information need be given in response to this Item 7(f) as to any remuneration or other transaction reported in response to Item 7(a), (b), (c), (d), or (e) . . . .
 Plaintiff made related contentions with respect to the 1975 and 1976 proxy statements.
 
 
 [11]
 Plaintiff's appeal complains of the restrictions on discovery as well as of the dismissal of the action
 
 
 [12]
 Because of illness, the ninth director, G. B. Zornow, was not deposed
 
 
 [13]
 It is too well settled to admit of controversy that ordinarily neither the directors nor the other officers of a corporation are liable for mere mistake or errors of judgment, either of law or fact. In other words, directors of a commercial corporation may take chances, the same kind of chances that a man would take in his own business. Because they are given this wide latitude, the law will not hold directors liable for honest errors, for mistakes of judgment, when they act without corrupt motive and in good faith, that is, for mistakes which may properly be classified under the head of honest mistakes. And that is true even though the errors may be so gross that they may demonstrate the unfitness of the directors to manage the corporate affairs. This rule is commonly referred to as the "business judgment rule," which generally applies to decisions of executive officers as well as those of directors. The basis of this rule is the wide latitude that directors of a corporation are given in the management of the affairs of a corporation provided always that judgment, and that means an honest, unbiased judgment, is reasonably exercised by them
 3A Fletcher, supra at 37-38 (footnotes omitted).
 
 
 [14]
 Even under a grouping-of-contacts approach there appears to be no basis in the present case for believing that a New York court would apply any law other than that of Ohio
 
 
 [15]
 Plaintiff made no demand on the directors that TRW institute this action, and asserted that demand would have been futile because the directors had approved, acquiesced in, or were parties to the wrongs alleged. (Complaint P 47.) The district court held that the defendants had waived any defense based on plaintiff's failure to make a demand. (A.864.)
 
 
 [16]
 E. g., Ohio R.Civ.P. 23.1; Roderick v. Canton Hog Ranch Co., 46 Ohio App. 475, 189 N.E. 669 (1933)
 
 
 [17]
 In Klotz v. Consolidated Edison Co., 386 F.Supp. 577 (S.D.N.Y.1974), the directors who had rejected the plaintiff's demand were made merely nominal defendants to the suit against third parties; no claim for relief was asserted against the directors. The court properly found that the mere naming of the directors in this fashion did not make them "interested" for the purpose of the business judgment rule
 See also Lewis v. Anderson, 615 F.2d 778 (Current) Fed.Sec.L.Rep. (CCH) P 97, 153 (9th Cir. 1979), in which the special litigation committee which voted to bar suit consisted of two persons who had become directors of the corporation after the occurrence of the challenged transactions, and one person who was "a named defendant, but who did not benefit from the challenged transactions." Id. at 780, Fed.Sec.L.Rep. (CCH) at 96, 365. The district court held that such exercise of business judgment would be permissible if done in good faith, and reserved for trial the question whether the committee actually made a good faith determination. The Ninth Circuit affirmed, viewing the committee as disinterested because they were "not involved in the alleged violations." Id. The court concluded as follows: "Our decision here, like that in (Auerbach v. Bennett, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979)), is that the good faith exercise of business judgment by a special litigation committee of disinterested directors is immune to attack by shareholders or the courts." Id. at 783, Fed.Sec.L.Rep. (CCH) at 96, 367.
 
 
 [18]
 Defendants' reliance on Maldonado v. Flynn, 597 F.2d 789 (2d Cir. 1979), is misplaced. They argue that a director's "interest" is to be determined without reference to whether or not he is a defendant to the suit, asserting that disinterest has been "defined by this Court to mean 'lack of any financial stake by a director in the transaction under consideration'." (Defendants-Appellees' Brief on Appeal at 1.) In Maldonado, however, the Court was not confronted with a motion to dismiss on the basis of the business judgment rule, but rather with a motion to dismiss for failure to state a claim on which relief could be granted. The "interest" issue was pertinent to the question whether approval of a transaction by a fully informed majority of the board of directors of a corporation would suffice to bar a Rule 106-5 claim that the corporation, or its stockholders, were deceived. If the directors were disinterested, their knowledge could be imputed to the corporation and the element of deception, required for a Rule 106-5 claim, would be lacking. The Maldonado Court stated that "(f)or this purpose 'disinterest' is defined as lack of any financial stake by a director in the transaction under consideration." Id. at 793 (emphasis added). Maldonado did not purport to define disinterest for the quite different purposes of the business judgment rule
 
 
 [19]
 We disagree with the district court's suggestion, in attempting to distinguish the Nussbacher case (A.859-60) that when the business judgment refusal by directors to pursue a corporate claim is invoked as a defense by a third party, closer scrutiny of the objectivity of the directors' decision is required than if the defense had been invoked by the corporation or the directors themselves
 
 
 [20]
 If, for example, Ohio law empowered any director who had no direct stake in a transaction to exercise his business judgment so as to bar a derivative action with respect to that transaction, application of that principle might mean, with respect to a § 14(a) challenge to the election of certain directors, that defendant directors who authorized the proxy statement relating to the election but were not themselves up for re-election could bar the § 14(a) claim. Such a result would frustrate the policies underlying § 14(a) and could not be tolerated
 We have noted supra that Ohio law appears to allow a business judgment dismissal at the instance of directors who are not defendants. E. g., Rice v. Wheeling Dollar Savings & Trust Co., supra, 130 N.E.2d at 448. We do not know whether Ohio law would permit the directors, in a case where all directors are defendants, to appoint a committee of disinterested non-directors to investigate the facts and decide whether or not it is good business judgment for the litigation to proceed. State law has traditionally placed limitations on delegations of decisionmaking authority by a board of directors, at least with respect to decisions of fundamental importance to the corporation. See 2 Fletcher, supra § 497 (rev. ed. 1969). However, if Ohio law would permit such a delegation, and if the delegation would not contravene the policies underlying § 14(a) questions we leave for another day then TRW would have a means of avoiding the pursuit, purportedly in its behalf, of litigation found not to be in its best interest.
 While we express no view as to whether a state law interpretation permitting non-defendant directors, or a duly appointed committee of disinterested non- directors, to initiate a business judgment dismissal of § 14(a) claims would contravene federal policy, cf. Burks v. Lasker, supra, we note that the Ninth Circuit has opined that such a dismissal
 would in no way weaken the regulatory provisions of the federal securities laws. So long as those accused of manipulating the proxy vote are excluded from deciding whether or not to pursue the claim there is no conflict between the business judgment rule and § 14(a).
 Lewis v. Anderson, supra at 784, Fed.Sec.L.Rep. at 96, 368.
 
 
 [21]
 The complaint asserts that the plan to make conditional grants and regrants was adopted in or about March 1974 (Complaint P 27); the deposition of one TRW director indicates that the possibility of such grants had been considered prior to 1973. (Ramo Deposition at 70-71.) Information as to corporate planning and the timing of corporate decisions are peculiarly within the control of the corporation's management, and we note that certain of plaintiff's interrogatories on these questions went unanswered because of the order limiting discovery to the issue of the nine directors' good faith in invoking the business judgment rule. Plaintiff should be allowed appropriate discovery into the merits of his viable § 14(a) claims on remand
 
 
 [22]
 Plaintiff contends that without precise disclosure of the power to retrieve old unexercised options through grants of new options conditioned on surrender of the old options, "a shareholder would have never imagined" that new options with lower prices could, in effect, replace older options with higher prices (Appellant's Brief at 9), and that "(t)his was especially so in 1973." (Id. at 7.) Whether or not the failure of an option plan to itemize the conditions that the committee may impose in making grants is a material omission, is a question to be adjudicated. We note, moreover, that some years before 1973, TRW may have issued options that were conditioned upon the optionee's allowing to lapse previously granted options for an equivalent number of shares with exercise prices that were higher than the exercise prices of the new conditionally granted options, and reflected these actions in the 1973 proxy statement (A.273-74) as well as in earlier proxy statements (A.242-43; A.262-63). Thus, there may also be questions of whether or not there is a material difference between conditioning a grant on the optionee's allowing the earlier option to lapse and conditioning the grant on his surrendering it, see Cohen v. Ayers, 596 F.2d 733, 737-38 (7th Cir. 1979), or of whether or not these reports with respect to earlier option plans should have alerted shareholders that conditional grants effectively lowering the prices of outstanding options would be possible under the 1973 option plan
 
 
 [23]
 Defendants argue, for example, that the information plaintiff complains was omitted was in fact disclosed because the 1975 proxy statement noted that there were no pre-1974 options outstanding, and the 1974 annual report sent to shareholders with the 1975 proxy statement, stated that
 (d)uring 1974, stock options for 871,358 shares were granted at option prices ranging from $13.56 to $18.00 per share. Such options remained outstanding upon the surrender of stock options for an equal number of shares previously granted at higher option prices.
 (A.347.) The claim that disclosures in other documents cured any inadequacy of the proxy statements goes to the merits of the claim rather than to the adequacy of the pleading. The sufficiency of these disclosures and the materiality of any non-disclosures are questions to be decided in the first instance in the district court.
 We note also that there may be a problem of mootness, since all of the terms of the directors elected in 1974, 1975 and 1976 have expired. See Browning Debenture Holders' Committee v. DASA Corp., 524 F.2d 811 (2d Cir. 1975).
 
 
 [24]
 We recognize the possibility that stockholders may assert meritless § 14(a) claims for the sole purpose of invoking federal jurisdiction. But this risk should be lessened by Fed.R.Civ.P. 11, which requires that the pleading of a party represented by counsel be signed by at least one attorney in his individual name, and which further provides:
 The signature of an attorney constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information, and belief there is good ground to support it; and that it is not interposed for delay. . . . For a wilful violation of this rule an attorney may be subjected to appropriate disciplinary action.